IN THE UNITED STATES DISTRICT COURT
FOR NEW HAMPSHIRE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF 3 SMARTPHONES, CURRENTLY LOCATED AT THE MANCHESTER POLICE DEPARTMENT EVIDENCE VAULT | Case No. 1:20-mj- 176-01/03-AJ <br><br> Filed Under Seal – Level I |

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION UNDER RULE 41 FOR A
WARRANT TO SEARCH AND SEIZE**

I, Patrick Dawley, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.      I am a Special Agent (SA) with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), and have been since February of 2019.  I am currently assigned to the Manchester, New Hampshire Field Office in the Boston Field Division.  While training to become a Special Agent, I attended the Federal Law Enforcement Training Center (FLETC) in Glynco, GA full-time for six-and- a-half months. During my time at FLETC, I received training in practices and methods of illegal firearm possessors, firearm traffickers, and related federal criminal statutes. Prior to becoming an ATF Special Agent, I was a Police Officer for the Reading, Massachusetts Police Department for approximately seven years.  As a Special Agent and Police Officer I have conducted and/or participated in a number

of investigations involving state and federal firearm and controlled substance violations.  I have interviewed multiple victims, sources of information, witnesses, suspects and defendants regarding various types of criminal activity.  I have also served search warrants for various crimes and have made criminal arrests for firearm and controlled substance violations. I participated in state and federal investigations involving possession of illegal weapons including firearms, improvised explosive devices and possession of controlled substances.  I also conducted numerous investigative stops and probable cause searches of people and vehicles.  I participated in physical surveillance operations and participated in the execution of state and federal arrest warrants.

3.      Based on my training and experience, I am aware that drug traffickers commonly use cellular telephones to communicate and further their drug-trafficking activities.  However, drug traffickers are aware of law enforcement's use of electronic surveillance, and thus frequently endeavor to thwart detection by changing cellular telephone numbers, using multiple cellular phones at the same time, and/or utilizing prepaid cellular phones where the user of the phone is not required to provide personal identifying information.  I am also aware that drug traffickers frequently "drop" or change cellular telephone numbers and cellular telephones in an effort to thwart law enforcement's use of electronic surveillance.  I am familiar with the manner in which drug traffickers use telephone, coded, veiled, or slang-filled telephone conversations when discussing their illegal business, in an effort to further prevent detection, and that they often use text messages in lieu of phone calls to avoid speaking over the telephone.

4.      I am familiar with the facts and circumstances of this investigation from my own personal participation and from oral and written reports given to me by other members of law enforcement. Since this affidavit is being submitted for the limited purpose of establishing that

probable cause exists to support the issuance of a search warrant, I have not included details about every aspect of the investigation. While this affidavit contains all the material information I am aware of that is pertinent to the requested search warrants, it does not set forth all of my knowledge about this matter.

## RELEVANT STATUTES

5.       Title 21, United States Code, Section 841(a)(1), makes it unlawful for any person to "manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." 21 U.S.C. § 841(a)(1). Heroin and Marijuana are Schedule I controlled substances.  Cocaine, Crack Cocaine, and Fentanyl are Schedule II controlled substances.

6.       Title 18, United States Code, Section 922(g) reads in pertinent part,

> It shall be unlawful for any person . . . who is an unlawful user of . . . any controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)) . . . to . . . possess in or affecting commerce, any firearm.

18 U.S.C. § 922(g)(3).  An unlawful user of a controlled substance is someone who is a current user of a controlled substance in a manner other than as prescribed by a licensed physician, and unlawful use must have occurred recently enough to indicate that the individual is actively engaged in such conduct.  It is not required that such a person use drugs at the precise time that the person possesses a firearm.  27 C.F.R. § 478.11.

7.       Title 18, United States Code, Section 924(c), prohibits the use or carrying of a firearm during and in relation to a drug trafficking offense, or possessing a firearm in furtherance of a drug trafficking offense.

## IDENTIFICATION OF THE ELECTRONIC EQUIPMENT TO BE EXAMINED

8.       This affidavit is being submitted in support of an application for a search warrant

for electronic equipment seized from Jose CRUZ ("CRUZ") and Leeann OBRIEN, pursuant to CRUZ's arrest and a search warrant conducted on August 17, 2020, on a 2008 Saab Model 9-3, bearing New Hampshire registration 4784041, registered to CRUZ, which he was operating at the time of his arrest. All of the following electronic equipment is currently located at the Manchester Police Department Evidence Vault:

    a.   A black LG LM-X410MK smartphone bearing International Mobile Equipment Identity ("IMEI") number 359584090710500 ("Telephone 1"), in a black and brown leather phone case (unknown model), labeled as *MPD Evidence Item "MAD1"*;

    b.   A black LG LM-X420MM smartphone bearing IMEI number 353535160314413 ("Telephone 2"), in a blue phone case (unknown model), labeled as *MPD Evidence Item "MAD2"*;

    c.   A black Samsung SM-A102U smartphone bearing IMEI number 359620108872641 ("Telephone 3"), labeled as *MPD Evidence Item "MAD3"*.

9.    The applied-for warrant would authorize the forensic examination of the electronic equipment for the purpose of identifying electronically stored data particularly described in Attachment B.

**PROBABLE CAUSE**

*Background*

10.     Along with other members of law enforcement, I am conducting an investigation of CRUZ and OBRIEN into the illegal trafficking of drugs and firearms in the Manchester, New Hampshire, including the suspected trading of firearms for either drugs or U.S. currency.

11.     On January 16, 2020 OBRIEN was arrested by the Manchester Police Department ("MPD") for possession with intent to distribute marijuana, possession of cocaine, and possession of crack cocaine. MPD seized $1345.00 USD currency from OBRIEN's person and seized the 2018 gray Nissan Altima, bearing Florida registration IEMR24, which OBRIEN was operating at the time of her arrest, pending a search warrant. CRUZ was the sole passenger in the vehicle and was allowed to leave the scene during the active motor vehicle just prior to the arrest. A state search warrant was obtained for the 2018 gray Nissan Altima, rented in OBRIEN's name, and executed on January 21, 2020. The search warrant yielded a Raven Arms P-25 .25 caliber pistol, bearing serial number 561422, 21 cell phones, a tablet, 2 laptops, approximately $25,500.00 in jewelry, seven (7) rounds of 9mm ammunition, approximately 958.4 grams of suspected marijuana, approximately 20.8 grams of suspected crack cocaine, approximately 18.9 grams of suspected heroin/fentanyl, approximately 15.3 grams of suspected synthetic spice, approximately 9.6 grams of suspected cocaine, seven (7) vials of testosterone, 117 assorted controlled pills, a large amount of drug packaging materials, money envelopes and digital scales. Also located during the search was a drug ledger containing the address for 32 Myrtle Street, Apt 3-C (unknown city and state), a rental receipt for Storage Unit #408, Bluebird Self Storage, 97 Brown Avenue, Manchester, NH (the "Storage Unit") in the name of Jose CRUZ, a receipt for

the purchase of a Sig Sauer P365 9mm pistol, bearing serial number 66A289059, from NH Guns & Ammo in Derry, NH and assorted bags of personal items belonging to Leeann OBRIEN and Jose CRUZ. All of the items tested presumptive positive using a TacticID raman spectrometer.

12.     I know through my knowledge training and experience that the quantities of suspected marijuana found on OBRIEN's person and inside of the vehicle were not consistent with personal use. I also know that the scales, assorted packaging materials, items such as the fake Red Bull can containing controlled substances not prescribed to the possessors, a firearm and a large amount of US Currency found in OBRIEN's purse were all consistent with the distribution of illegal drugs.

*Suspected Firearms and Drug Trafficking From New Hampshire to Camden, New Jersey*

13.     Between August 2019 to present, OBRIEN and CRUZ have been observed and confirmed to have traveled from the Manchester, New Hampshire area to Camden, New Jersey on a regular basis. It has been confirmed through reliable, confirmed sources of information and through the recovery of numerous firearms originating from New Hampshire, through seizures and undercover controlled purchase operations, that CRUZ and OBRIEN trafficking illegally obtained firearms from New Hampshire to Camden, New Jersey in exchange for drugs.

*Federal GPS Tracking Warrant for the 2015 Acura RDX:*

14.     On May 7, 2020, I applied for and was granted a sealed federal tracking warrant for a Global Positioning System ("GPS") mobile tracking device to be installed on the 2015 Acura RDX. On May 7, 2020, the Honorable Andrea Johnstone, of the District of New Hampshire, signed the aforementioned sealed federal tracking warrant.

15.     On May 8, 2020, I installed the GPS mobile tracking device on the 2015 Acura RDX while it was parked on a public way in the vicinity of the 200 block of Concord Street in

Manchester. I learned through the Manchester Street Crimes Unit that during a drug possession post-arrest debrief of Source T.S. on May 4, 2020, the 2015 Acura RDX had been observed parked in the parking lot of 286 Concord Street, Manchester. Source T.S. stated both Leeann OBRIEN and CRUZ were both observed entering the 2015 Acura RDX after exiting 286 Concord Street, Manchester. Between May 4, 2020 and May 8, 2020, the 2015 Acura RDX was observed in and around the vicinity of the 200 block of Concord Street, as well as parked in the parking lot of 286 Concord Street, thus corroborating the information.

16.     On May 9, 2020, I observed Leeann OBRIEN arrive to the residence of 141A Laurel Street, Manchester in the 2015 Acura RDX and enter the residence empty handed. I observed Leeann OBRIEN exit the residence with two orange packages, one tucked under her left arm and the other in her left hand. I recalled the orange packaging from suspected drugs seized during the execution of a state search warrant on January 21, 2020 on a Hertz rental vehicle, bearing Florida registration IEMR24, rented to Leeann OBRIEN. I know through my training and experience that the size of the orange packaged suspected drugs were consistent with distribution related quantities of drugs. Leeann OBRIEN later made frequent stops to known high crime areas in and around the City of Manchester.

17.     On May 11, 2020, I observed surveillance video of the 2015 Acura RDX at Z1Xpress Gas Station located on Goffstown Back Road in Goffstown, NH, which according to the GPS mobile tracking device record, the 2015 Acura RDX visited on May 10, 2020 at approximately 3:11 PM. I observed Leeann OBRIEN fill the 2015 Acura RDX with gasoline with the driver's side door opened. I readily observed and identified an orange package on the opened door, which was consistent with the orange packages observed in the hands of Leeann OBRIEN on May 9, 2020, while exiting 141A Laurel Street, Manchester and from the suspected

drugs seized from the state search warrant on January 21, 2020.

*May 12, 2020 Arrest and Federal Search Warrant of 2015 Acura RDX:*

18.     On May 12, 2020 Leeann OBRIEN was arrested by MPD for possession of Heroin/Fentanyl and an active arrest warrant for Possession of Controlled Drugs. and seized a rolled $20.00 bill and a $1.00 bill, both with a powdery residue believed to be Heroin /Fentanyl from Leeann OBRIEN's person pursuant to a consent search. CRUZ was the sole passenger of the motor vehicle which had just been surveilled and corroborated via GPS tracking data, to make a round trip from Manchester, New Hampshire to Camden, New Jersey in approximately thirteen and one-half hours.

19.     On May 12, 2020, while on recorded video, Leeann OBRIEN was observed and later admitted via recorded phone call, to retrieving, using and providing other inmates suspected cocaine, which had been concealed inside of a body cavity on her person while in custody at the Hillsborough County Department of Corrections ("HCDOC").

20.     Through my training and experience, I know that drug traffickers frequently will conceal packaged drugs inside of body cavities that would go undetected to standard procedural searches.

21.     On May 12, 2020 a sealed federal search warrant for 2015 Acura RDX was granted and signed by the Honorable Magistrate Johnstone, and executed the same day. The search warrant yielded personal use amounts of Suboxone, ecstasy pills and suspected cocaine residue, a round of 9mm ammunition, eighteen (18) cell phones, $512 US Currency, numerous gift cards and credit credits in the name of Leeann OBRIEN and numerous drug packaging materials, such as scales, baggies, money envelopes and hides. All of the items tested presumptive positive using a TacticID raman spectrometer.

22.     Based on my training and experience, including my knowledge of drug trafficking, I know that traffickers often have a range of different substances available for distribution to cater to the needs of different customers.

*2008 Gray Saab 9-3*

23.     I observed a letter and photographs sent by CRUZ to Leeann OBRIEN at HCDOC, which depicts CRUZ next to a gray Saab sedan, later confirmed to be a 2008 Saab Model 9-3 with VIN number YS3FB49Y181013178, bearing New Hampshire registration 4784041 ("the 2008 Saab 9-3").  The 2008 Saab 9-3 is registered to Jose CRUZ with a listed New Hampshire address of 141A Laurel Street, Manchester, NH. I observed CRUZ reference the 2008 Saab 9-3 on a recorded phone call on approximately June 1, 2020, in which he stated he paid $1,000.00 to purchase it. I know that CRUZ does not have any legitimate bank accounts with financial institutions and have observed CRUZ only utilize cash for purchases. CRUZ also stated that he had not obtained legitimate employment, yet would continue to save the money he "was making" for when Leeann OBRIEN was released from HCDOC. CRUZ and Leeann OBRIEN spoke in coded language which through my training and experience, I believed to reference the sales of drugs. CRUZ frequently stated he "was trying to be good", in reference to obtaining a legitimate source of income and that he would have to "work". CRUZ referenced numerous trips to visit people in Camden, New Jersey between the time of Leeann OBRIEN's arrest on May 12, 2020 and the time of the phone call on June 1, 2020. CRUZ and Leeann OBRIEN also made reference to need to make an emergency trip to Camden, New Jersey, which I believed to be reference to the trip on May 11, 2020. CRUZ stated that a mistake was made and they were unable to obtain what they had traveled for. I know through my training and experience and through the aforementioned facts of this investigation that CRUZ and Leeann

OBRIEN regularly traveled to Camden, New Jersey to obtain drugs. The lack of distribution amounts of drugs in 2015 Acura RDX was explained by CRUZ's and Leeann OBRIEN's admission that they failed to obtain suspected drugs on May 11, 2020 for unknown reasons.

24.     On July 23, 2020, I observed the 2008 Saab 9-3 parked in the parking lot of 286 Concord Street, Manchester, NH and confirmed the registration to be 4784041.

25.     I learned through LPR data that from June 26, 2020 through July 14, 2020 the 2008 Saab 9-3, was documented thirteen (13) times in Camden, NJ.

26.     I learned from Investigator Sean Richards of the Essex County Sheriff's Department Gang Unit that on July 23, 2020 at approximately 1:08 PM, the 2008 Saab 9-3 was observed operated by a Hispanic male, matching the description of CRUZ, on Exchange Street in Lawrence, Massachusetts. Investigator Richards observed the 2008 Saab 9-3 abruptly pull over to the curb on Park Street at the intersection of Exchange Street and within a matter of moments, the vehicle was mobile again, traveled down Myrtle Street and left the area.

27.     I learned from GPS data on May 8, 2020 that 2015 Acura RDX traveled to the intersection of Willow Street and Alder Street, approximately one block away from where Investigator Richards observed the 2008 Saab 9-3 on July 23, 2020. The location is approximately one additional block from the approximate address of "32 Myrtle Street", which was located on a "ledger" during the state search warrant of Vehicle #1 on January 21, 2020. I know through ATF TFO and Lawrence Detective Sean O'Keefe that this particular area is a high crime area, known for drug distribute and is gang territory for the Trinitario street gang. I learned that 32 Myrtle Street is not a legitimate address in the city of Lawrence, Massachusetts.

*August 12, 2020 CRUZ Arrest and 2008 Saab 9-3 Seizure*

28.     On August 12, 2020, I learned from MPD Detective DeJoy that mobile

surveillance was conducted when O'BRIEN was observed operating the 2008 Saab 9-3 in Manchester, New Hampshire. The 2008 Saab 9-3 was surveilled on a direct trip with no additional stops from Manchester, New Hampshire to Lawrence, Massachusetts. The 2008 Saab 9-3 parked in the vicinity of Willow Street at the intersection of Alder Street in Lawrence, Massachusetts. I am familiar with this location through GPS location data from 2015 Acura RDX on May 8, 2020 and by observation made by the Essex County Sheriffs Gang Unit on July 23, 2020.

29.     CRUZ was observed exiting the front passenger side of the 2008 Saab 9-3 and walked down the driveway of 119 Willow Street, along the right side of the residence and out of sight for approximately 30 seconds. As CRUZ had exited the vehicle, O'Brien exited the driver side of the 2008 Saab 9-3 and got into the passenger side of the 2008 Saab 9-3. CRUZ returned to the 2008 Saab 9-3 to the front driver seat.

30.     The 2008 Saab 9-3, operated by CRUZ, was surveilled back to Manchester, New Hampshire via Route 93. Detective DeJoy observed the 2008 Saab 9-3 fail to use a turn signal while taking the Route 93 Exit 6 off-ramp. MPD conducted a motor vehicle stop in the vicinity of 660 Hanover Street, Manchester, New Hampshire.

31.     During the motor vehicle stop CRUZ was identified as the operator. CRUZ was untruthful during the motor vehicle stop and stated he had just come from visiting a friend in Derry, New Hampshire, which was not true as he had been surveilled on a direct trip from Manchester, New Hampshire to Lawrence, Massachusetts and back. CRUZ provided consent to search his person to Detective Olson, who located a bag of suspected heroin/fentanyl inside the pocket of CRUZ's shorts. CRUZ was placed under arrest for possession of a controlled substance I am booked at MPD.

32.     OBRIEN provided consent to search her person which yielded negative results for contraband. On May 12, 2020, the Hillsborough County Department of corrections documented the observation of OBRIEN removing suspected drugs which were inside of a body cavity during her booking process. Based upon OBRIEN's past history of concealing drugs inside of her body cavities, MPD took additional precautions to include attempting to obtain the assistance of a New Hampshire State Police Narcotics Detection Canine Unit, with specific experience in detecting drugs concealed on persons. However, the length of the interaction and time until the canine unit would be on scene would be longer than reasonable for the motor vehicle stop and OBRIEN was released and departed the area.

33.     The vehicle was seized pending a state search warrant and towed by Queen City Towing to MPD where it was secured in the evidence garage.

### *Federal Search Warrant on Acura RDX*

34.     On August 17, 2020, the Honorable Magistrate Lyons granted a State of New Hampshire search warrant for the 2008 gray Saab 9-3, which was operated by CRUZ during the encounter that led his arrest on August 12, 2020.

35.     Prior to searching the vehicle, I observed numerous plastic panels in various parts of the passenger compartment and on the exterior of the vehicle, to be temporarily in place or modified. I know through his training and experience that drug and firearm traffickers frequently modify vehicles to conceal contraband from law enforcement and to transport it from a source to market state.

36.    As a result of the search warrant I observed the following items located inside of the vehicle:

    a.    Telephone 1, a box for Telephone 2 and a baseball-style hat with "LK", which I believe to mean Latin Kings, were found on the trunk of the vehicle; and

    b.    Telephone 2 and Telephone 3 were located with $50 US Currency near the center console.

    c.    Receipts of cash purchases, to include: the bill of sale for the 2008 Saab 9-3 for $600.00 on June 13, 2020, as well as a $200.00 Walmart MoneyGram transaction on August 5, 2020.

37.    Based on the proximity of the electronic equipment to CRUZ, who contained the seized drugs on his person, and other evidence of drug trafficking, OBRIEN, CRUZ and possibly others have used the electronic equipment, including cellular telephones, to participate in and facilitate illegal activity.

38.    In addition, based on my training and experience, and information provided to me by other agents, I am aware that individuals involved in drug trafficking frequently use computers and other electronic devices, including smartphones, to carry out, communicate about, and store records related to drugs and drug trafficking. These tasks are frequently accomplished through text messages, encrypted messages, and photographs. Based on my training and experience, I know that dealers and others involved in the drug trade frequently utilize multiple mobile phones in connection with their illegal drug activity. For example, individuals involved in drug trafficking frequently utilize one phone to communicate with drug customers and another phone to communicate with other drug-related associates (*e.g.*, suppliers, runners, organizers).

Individuals involved in drug trafficking frequently change their phones and/or phone numbers, and their utilization of multiple phones can mitigate the disruption associated with these changes (for example, a dealer can change the phone used to communicate with drug suppliers or organizers while not changing the phone used to communicate with customers, or vice versa).

39.     The sheer volume of electronic devices so far seized over the course of the investigation since January 21, 2020 is overwhelming and at odds with normal electronic device ownership and use, contributing to the strong inference that the phones were being used to conduct illegal activity.

## TECHNICAL TERMS

40.      Based on my training and experience, I use the following technical terms to convey the following meanings:

  a.   Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing

dates, appointments, and other information on personal calendars; and accessing

and downloading information from the Internet.  Wireless telephones may also

include global positioning system ("GPS") technology for determining the

location of the electronic equipment.

b.   Digital camera:  A digital camera is a camera that records pictures as digital

picture files, rather than by using photographic film.  Digital cameras use a

variety of fixed and removable storage media to store their recorded images.

Images can usually be retrieved by connecting the camera to a computer or by

connecting the removable storage medium to a separate reader.  Removable

storage media include various types of flash memory cards or miniature hard

drives.  Most digital cameras also include a screen for viewing the stored images.

This storage media can contain any digital data, including data unrelated to

photographs or videos.

c.   Portable media player:  A portable media player (or "MP3 Player" or iPod) is a

handheld digital storage device designed primarily to store and play audio, video,

or photographic files.  However, a portable media player can also store other

digital data.  Some portable media players can use removable storage media.

Removable storage media include various types of flash memory cards or

miniature hard drives.  This removable storage media can also store any digital

data.  Depending on the model, a portable media player may have the ability to

store very large amounts of electronic data and may offer additional features such

as a calendar, contact list, clock, or games.

d.  GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets,

and presentations.  PDAs may also include global positioning system ("GPS") technology for determining the location of the electronic equipment.

f.   Tablet:  A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook that is primarily operated by touching the screen.  Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "Wi-Fi" networks, or otherwise.  Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions.  Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g.   Pager:  A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network.  Some pagers enable the user to send, as well as receive, text messages.

h.   IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP

addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

i. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the electronic equipment communicating with each other are in the same state.

41.     Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online on their public domain websites, I know that the electronic equipment has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the electronic equipment.

42.     Based on my training, experience, and search, I know that the use of the internet and downloaded applications are used by persons as an alternative means of communication, to obtain information, directions and purchase supplies for the packaging and distribution of illegal dangerous drugs, as well as for the procurement and distribution of firearms.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

43.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the

Internet are typically stored for some period of time on the electronic equipment.  This information can sometimes be recovered with forensics tools.

44.    *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the electronic equipment was used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the electronic equipment because:

j.    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

k.    A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

l.    The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is

evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

m. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

45.    *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

46.    *Manner of execution.*  Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night. I intend to present the device to a forensic examiner for content extraction.

## **CONCLUSION**

47.     I submit that this affidavit supports probable cause that the electronic equipment

contains evidence of the distribution of and possession with intent to distribute  controlled

substances, in violation of 21 U.S.C. § 841, and other violations, and for a search warrant

authorizing the examination of the electronic equipment described in Attachment A to seek the

items described in Attachment B.

Dated: September 29, 2020          /s/ Patrick Dawley
                                   Patrick Dawley
                                   Special Agent
                                   Bureau of Alcohol, Tobacco, Firearms,
                                   & Explosives

The affiant appeared before me by telephonic conference on this date pursuant to Fed. R.

Crim. P. 4.1 and affirmed under oath the content of this affidavit and application.

Hon. Andrea Johnstone
United States Magistrate Judge
District of New Hampshire
Sep 30, 2020

## ATTACHMENT A

All of the following electronic equipment is currently located at the Manchester Police Department Evidence Vault:

     a. A black LG LM-X410MK smartphone bearing International Mobile Equipment Identity ("IMEI") number 359584090710500 ("Telephone 1"), in a black and brown leather phone case (unknown model), labeled as *MPD Evidence Item "MAD1"*;

     b. A black LG LM-X420MM smartphone bearing IMEI number 353535160314413 ("Telephone 2"), in a blue phone case (unknown model), labeled as *MPD Evidence Item "MAD2"*;

     c. A black Samsung SM-A102U smartphone bearing IMEI number 359620108872641 ("Telephone 3"), labeled as *MPD Evidence Item "MAD3"*.

     This warrant authorizes the forensic examination of the electronic equipment for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1.      All records on the electronic equipment described in Attachment A that relate to

violations of 18 U.S.C. § 922(g)(3), Possession of a Firearm by a Drug User, 21 U.S.C. § 841,

Unlawful Distribution and Manufacturing of a Controlled Substance, and 18 U.S.C. § 924(c),

possession or use of a firearm in furtherance of drug trafficking, including:

    a.   any information, including text messages, videos, photographs, internet browser
history and application use, related to the possession of a firearm and/or drug use,
distribution, or manufacturing.

    b.   any information related to sources of firearms and drugs (including names,
addresses, phone numbers, or any other identifying information).

    c.   Any information related to the conversion of proceeds of illegal firearm and drug
distribution proceeds into other items of value, like jewelry.

2.      Evidence of user attribution showing who used or owned the electronic equipment

at the time the things described in this warrant were created, edited, or deleted, such as logs,

phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items

of evidence in whatever form and by whatever means they may have been created or stored,

including any form of computer or electronic storage (such as flash memory or other media that

can store data) and any photographic form.